**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

CATRINA C.,
     Plaintiff,

v.

     Case No. 4:18-cv-04132-SLD-JEH

COMMISSIONER OF SOCIAL
SECURITY,
     Defendant.

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 12), the Defendant's Motion for Summary Affirmance (Doc. 17), and the Plaintiff's Reply (Doc. 19). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted. [1]

**I**

Catrina C. filed an application for disability insurance benefits (DIB) on April 15, 2014 and alleged disability beginning on December 22, 2012. Her claim was denied initially on October 15, 2014 and upon reconsideration on June 2, 2015. Catrina filed a request for hearing concerning her application for DIB. A hearing was held before the Honorable John M. Wood (ALJ) on August 9, 2016. At that hearing, Catrina was represented by an attorney and a vocational expert (VE) testified. Following the hearing, Catrina's claim was denied on April 14, 2017. Her

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 8) on the docket

request for review by the Appeals Council was denied on October 25, 2017, making the ALJ's Decision the final decision of the Commissioner. Catrina filed the instant civil action seeking review of the ALJ's Decision on July 19, 2018.

## II

At her August 2016 hearing, Catrina was 40 years old and lived with her seven-year-old daughter and boyfriend in a home in Monmouth, Illinois. She alleged the following conditions limited her ability to work: rheumatoid arthritis (RA) with nodules; fibromyalgia; degenerated and herniated discs; irritable bowel syndrome; polycystic ovarian syndrome; bone spurs on front of spine; poly inflammatory arthritis; memory problems; fatigue; and bone spur and cyst on right heel. AR 251.

Catrina testified that she was able to get up and down the stairs in her home "most days," and she "sometimes" drove. AR 83, 84. As for the last time she worked, Catrina worked as a companion to a disabled woman. The job entailed washing a few dishes for the woman, turning her pillow over for her, doing some light dusting, and sometimes having to physically re-adjust the woman. Catrina did not believe she could do that job at present (at the time of the hearing) because she could not physically help the woman adjust anymore. She testified she was otherwise too tired to work a full day, even if the job were simple and Catrina could stand when she wanted, sit when she wanted, and lift no more than five or 10 pounds. She also said another reason she would be unable to work was because there were days she did not drive due to experiencing a flare and because of pain she had. When she did not have flare ups, Catrina was able to do household tasks such as cooking, laundry, dishes, and cleaning. She mentioned she had help with the laundry and did not carry the laundry baskets and did not vacuum because she could not push and pull it. She cooked "most weeks," did the dishes when she was "able to," and usually had help when she grocery shopped. AR 86, 87.

2

As for her flare ups, Catrina said they came and went, but she "usually" had them most days, and some had lasted an afternoon while some had lasted for three weeks.  AR 87.  She left her home to take her daughter to and from school which, that year, entailed a three-block drive.  Every few months she visited her father who lived an hour away.  In the summer, if "up for it," Catrina liked to go fishing which involved standing on a bridge, and she was "sometimes" able to reel the fish in herself.  AR 88, 89.  As of the summer of the hearing, Catrina was able to go fishing twice.  She said she was no longer able to go to church because she was falling asleep in church.  She went to see her boyfriend's family every couple of months, and the friends Catrina still had she talked to on the phone or via text message.  She testified she used to read but could not stay focused long enough to do so anymore.  The last book she read was right after the new year.  She attended parent-teacher conferences and music concerts at her daughter's school.

Catrina's attorney then questioned her.  Catrina explained her pain flares to be caused by her RA and that they felt like hot concrete had been poured into her joints "all over."  AR 92.  Catrina stated that she had headaches "[a]lmost daily," and they were made worse by stress, being too tired, and too much noise.  AR 93.  Catrina elaborated regarding her daily naps that they lasted anywhere from a half hour to two hours, and she usually took two per day.  Catrina testified that her daughter helped her with cleaning the house and laundry, her daughter's cousin took her daughter to church, and friends dropped her daughter off at school.  She could push a grocery cart if it was not too full.

Upon her attorney pointing out that Catrina used a walker, Catrina explained the walker was prescribed because she was having problems with her balance.  She said she would "get so far and then [she had] to stop and sit down." AR 94.  Also upon her attorney pointing it out, Catrina explained she had a brace on her right leg due to a fractured heel and torn Achilles tendon.  She stated it was

3

not yet fully healed so the doctor had her wear the brace to try to keep her foot "lined up."  AR 94.  Catrina confirmed that she noticed a difference in her memory since the onset of her disability and currently used reminders for her medications, necessary groceries and household items, and events like registration day at her daughter's school.  She was "sometimes" able to use a keyboard when she was not "flaring" in her hands and wrists.  AR 96.

The VE was next questioned.

### III

The ALJ determined Catrina had the following severe impairments:  RA; polycystic ovarian syndrome; fibromyalgia; obesity; degenerative changes of the cervical spine; degenerative disc disease and osteoarthritis lumbosacral spine; and right Achilles tendinitis.  AR 24.  The ALJ made the following residual functional capacity (RFC) finding in his Decision:

> [T]he claimant had the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except no climbing ladders, ropes or scaffolds; no crawling or kneeling; other postural functions occasionally; occasional pushing/pulling with the upper and lower extremities; occasional overhead reaching; other manipulative functions frequently; must avoid hazards; no appreciable exposure to vibrations; must avoid concentrated exposure to extreme temperatures; and owing to chronic physical pain and side effects from medication, a limitation to the performance of simple and repetitive tasks involving little or no change in work routine and only occasional interactions with the public, coworkers and supervisors.

AR 25-26.  The ALJ discussed Catrina's July 2014 Function Report in which Catrina reported, among other things, difficulty staying focused on tasks, had extreme fatigue, had to take naps, could not lift over 10 pounds though some days even two or three pounds was too painful, she could not stay in one position for too long, walking was difficult for her, had flares that limited her movement, used a heating pad and took pain medications, walked unbalanced due to back pain, and

needed to change positions and rest often.  The ALJ noted that Catrina made similar complaints of pain symptoms and functional limitations in her hearing testimony and would not repeat them in his Decision for the sake of economy.

The ALJ also considered Catrina's daily activities which included driving, doing dishes, light cleaning, laundry, cooking, grocery shopping, caring for her seven-year-old daughter, and occasionally fishing.  The ALJ concluded such activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  AR 27.  The ALJ next concluded, regarding Catrina's alleged RA, fibromyalgia, obesity, degenerative changes of the cervical spine, and degenerative disc disease and osteoarthritis lumbosacral spine, the "longitudinal medical evidence of does [sic] not show diagnostic findings that correlate to pain symptoms or objectively determinable functional limitations that prevented the claimant from engaging in all substantial gainful activity."  *Id.*

The ALJ discussed Catrina's August 2014 internal medicine consultative examination and her complaints of generalized joint and body pains, pain flares, fatigue, difficulty with focusing and concentrating, and lapses of memory. Findings on examination at that time revealed she was unable to toe/heel walk, tandem walk, squat or hop on her right leg, had full grip strength and normal grasping and manipulation of both hands, had 16 of 18 fibromyalgia tender points, and had limited range of motion of the lumbar spine, the right ankle, and left shoulder.  She could walk 50 feet at that time, but did have a "mildly-antalgic" gait "with the use of a non-prescribed cane for confidence."  AR 27, *citing* AR 507.

The ALJ also discussed Catrina's treating rheumatologist Vaugh Hanna, M.D.'s treatment notes dated November 2014, February 2015, April 2016, and October 2016.  The ALJ cited Dr. Hanna's November 2014 objective examination during which Catrina demonstrated "moderate pain behaviors," exhibited tenderness of the MCP and PCP joints, reduced fist closure, and pain with limited

active ranges of motion of parts of her body. At her February 2015 appointment, Catrina alleged 8.5/10 pain, malaise/fatigue, and continued use of a cane or walker at times. She again showed "moderate pain behaviors." AR 28, *citing* 532. Dr. Hanna again noted "moderate pain behaviors" in April 2016, that Catrina ambulated using a cane and was wearing a boot cast, and she had no significant swelling or synovitis of peripheral joints but did have tenderness of certain identified muscles with a limited active range of motion of her lumbar spine with pain. The ALJ noted Dr. Hanna's treatment plan consisted of weaning Catrina off Prednisone, refilling Tylenol 3, a return visit in six months, laboratory testing ordered, physical therapy as needed, and podiatry and pain clinic follow-ups as recommended. Dr. Hanna's October 2016 treatment notes indicated "moderate pain behaviors," no edema or swelling, tenderness of the MCP and PCP joints, mild osteoarthritis changes of the hand, pain with limited active range of motion of the wrists and shoulders, tenderness of certain identified muscles, and limited active range of motion with pain.

The ALJ also detailed the results of a May 2015 lumbar spine x-ray (mild to moderate spondylosis of the lumbosacral spine) and a May 2015 cervical spine x-ray (moderate degenerative changes of the lower cervical spine and grade 1 retrolisthesis of C5 on C6). The ALJ detailed the results of Catrina's pulmonary function testing in September 2015 which were normal and at the lower limits of normal. Catrina presented to the emergency room in December 2015 for back pain that started the previous day and became worse as it went down her left leg. While she alleged 8/10 pain and a frequent occurrence of episodic pain, she did not appear in acute distress, exhibited no numbness or neurological abnormality, and straight leg raises were negative. The ALJ also quoted the results of a February 2016 lumbar spine MRI and a February 2016 cervical spine MRI.

The ALJ additionally discussed Catrina's right Achilles tendinitis and stated, "the record reveals a gap in treatment for the allegedly disabling symptoms with the longitudinal record not showing this impairment causes greater functional limitations than those found within this decision." AR 29. The ALJ noted Catrina's history of Achilles tendon repair in June 2014, results of MRIs and x-rays, and that Catrina started to use a right boot case and used a cane, walker, or scooter as needed. The ALJ concluded, "The medical evidence of record does not document this impairment has resulted in a lasting inability to ambulate effectively." *Id.*

The ALJ turned to the opinion evidence and explained the State Agency physicians' RFC conclusions supported a "not disabled" finding and deserved "some weight" where there existed "a number of other reasons to reach similar conclusions (as explained throughout [the] decision)." AR 30. The ALJ detailed treating Dr. Hanna's April 8, 2014 Arthritis Medical Source Statement which limited Catrina to walking 1-2 city blocks without rest, she could sit no longer than one hour at a time before needing to get up, and she could stand for 20 minutes at one time before needing to sit down or walk around. Dr. Hanna opined Catrina was limited to standing/walking about two hours total in an eight-hour work day, sitting about four hours total in an eight-hour work day with the need for a job to allow shifting positions at will from sitting, standing, or walking, she needed unscheduled breaks every two hours for five minutes, she was limited to lifting and carrying less than 10 pounds occasionally and 20 pounds rarely, and she was limited to no climbing ladders, occasionally climbing stairs, and rarely twisting, stooping/bending, and crouching/squatting. Dr. Hanna further opined Catrina would be off task where her symptoms were likely severe enough to interfere with attention and concentration needed to perform even simple work tasks 20% of the typical work day. He thus explained Catrina would miss about four days of work

7

per month as a result of her impairments or treatment.  The ALJ noted Dr. Hanna did not claim Catrina had any manipulative limitations of her upper extremities.

The ALJ determined Dr. Hanna's opinion was not entitled to controlling weight for "multiple reasons:"   1) his opinion was without substantial support from the other evidence of record "which obviously renders it less persuasive;" 2) his opinion that Catrina's symptoms would interfere with even simple tasks for 20% of the work day was unsupported by any objective testing or repeated clinical findings: 3) his opinion that Catrina would miss four or more work days as a result of her impairments was not supported by the medical evidence; and 4) the ALJ noted:

> while the claimant reports currently using a walker (and has done so at varying times during the period under consideration), a close examination of the medical records shows she obtained the prescription for the walker by alleging she reinjured her heel/foot during a consultative examination in late 2014 and resumed using a walker (along with other assistive devices) in early 2016, after reinjuring her heel/foot.

AR 31.  In support of his second reason to give Dr. Hanna's opinion less than controlling weight, the ALJ cited to a September 2014 psychological consultative examination performed by Stephen Paul Singley, M.A.

The ALJ gave "significant weight" to Medical Expert (ME) Alan Duby, M.D.'s Medical Interrogatory Physical Impairment(s) - Adults form dated October 8, 2016.  *Id.*  The ALJ noted that Dr. Duby was a specialist in rheumatology and internal medicine, that he opined Catrina did not meet the criteria of Listing 14.09 (Inflammatory arthritis) where he noted her rheumatologist's records appeared to end in B13F (part of the administrative record) dated June 19, 2014 to February 19, 2015, and that he opined as to Catrina's medically determinable impairments.  The ALJ also detailed Dr. Duby's opinions that Catrina was limited to lifting and

carrying up to 10 pounds frequently and 11 to 20 pounds occasionally, sitting two hours at one time without interruptions, standing 45 minutes without interruption, walking 30 minutes without interruption, sitting up to seven hours total in an eight-hour work day, standing up to two hours in an eight-hour work day, and walking one hour total in and eight-hour work day.  He opined she was limited to reaching overhead and pushing/pulling occasionally and all other reaching and handling, fingering, and feeling frequently bilaterally due to mild to moderate arthritic involvement of the shoulders, elbows, and hands.  Dr. Duby also opined Catrina was limited in the use of her right foot due to right Achilles tendinitis and was limited in all postural activities to occasionally due to back pain, arthritis involvement of the hips, and right Achilles tendon.

## IV

Catrina argues the ALJ erred in three ways:  1) the ALJ's adverse credibility finding is flawed because the ALJ failed to construct a logical bridge between the evidence and his conclusion; 2) the ALJ's RFC assessment is not supported by substantial evidence because it is incomplete and based on legally, factually, and logically flawed analyses; and 3) the ALJ's evaluation of the medical opinions is not supported by substantial evidence.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence.  *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989).  Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper

legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)      is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)      is unable to perform any other work existing in significant numbers in the national economy.

*Id*.  An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Catrina claims error on the ALJ's part at Step Four.

**A**

Catrina first argues that the ALJ's credibility finding was flawed where the ALJ failed to explain how her daily activities showed Catrina exaggerated her limitations or how they were consistent with a finding that she could perform full-time, competitive work.  She also argues the credibility finding was flawed where the ALJ failed to explain how the objective evidence did not correlate to her subjective complaints, and the ALJ erred by misunderstanding the nature of fibromyalgia.  The Commissioner counters that the ALJ reasonably considered Catrina's daily activities when he assessed the impact of her symptoms on her functioning, and the ALJ reasonably contrasted her symptom allegations with objective findings from her treating and examining medical sources and found her

11

allegations were not objectively corroborated to the disabling degree that she alleged.

SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. § 404.1529(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional imitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8.

In his assessment of Catrina's RFC, the ALJ stated up front that after careful consideration of the evidence, Catrina's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but her "statements concerning the intensity, persistence and limiting effects of [those] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision." AR 27. The first evidence the ALJ cited was that of Catrina's daily activities. He determined those activities "were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." *Id*. The ALJ pointed to Catrina's Function Reports and hearing testimony in which she reported driving, doing dishes, light cleaning, laundry, cooking, grocery shopping, caring for her seven-year-old daughter which included taking her to and from school and attending school activities, and occasionally fishing.

There is no indication in the Decision that the ALJ placed an undue emphasis on Catrina's daily activities.  He did not equate her ability to do those activities with the ability to do full-time work; he merely observed they were not as limited as one would expect in light of Catrina's complaints.  Her daily activities were properly considered pursuant to 20 C.F.R. § 404.1529.    In fact, the Commissioner argues that many of Catrina's statements qualifying her activities were accommodated by the ALJ's functional capacity limits.  Catrina essentially concedes as much in her Reply brief, but persists in arguing that the ALJ failed to construct a logical bridge to his conclusion discounting her symptoms such as regularly needing to rest or nap and being unable to perform basic tasks during her frequent flare-ups.

As for the ALJ's consideration of the objective medical evidence, he stated in terms of Catrina's RA, fibromyalgia, obesity, degenerative changes of the cervical spine, degenerative disc disease and osteoarthritis lumbosacral spine, "the longitudinal medical evidence of does [sic] not show diagnostic findings that correlate to pain symptoms or objectively determinable functional limitations that prevent the claimant from engaging in all substantial gainful activity."   AR 27. From there, the ALJ detailed:  the findings made during Catrina's August 2014 internal medicine consultative examination; treating Dr. Hanna's objective examination findings dated between November 2014 and October 2016; May 2015 lumbar and cervical spine x-ray results; a July 2015 normal musculoskeletal range of motion; September 2015 pulmonary function normal test results; no appearance of acute distress, no exhibited numbness or neurological abnormality, and negative straight leg raises during a December 2015 emergency room visit due to back pain; and February 2016 lumbar and cervical spine MRI results.  Upon the ALJ's consideration of Dr. Hanna's April 2014 Arthritis Medical Source Statement, the ALJ explained Catrina did not present in acute distress during her visits to Dr.

Hanna, and Dr. Hanna's opinion that Catrina's symptoms would interfere with even simple tasks for 20% of the work day was unsupported by any objective testing or repeated clinical findings. The ALJ also explained he gave weight to ME Dr. Duby's opinion as to Catrina's physical limitations where Dr. Duby's opinion was based upon his review of Catrina's "longitudinal medical evidence of record, and [was] consistent with the objective findings and other medical evidence of record." AR 31.

In light of all this, it is possible to deduce how the ALJ determined that the extent of Catrina's complaints did not correspond to the objective evidence. He built a logical bridge from the evidence to his conclusion that Catrina was not as limited by her symptoms as she alleged. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (explaining that an ALJ must build an accurate and logical bridge from the evidence to his conclusion so that the reviewing court may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review). The ALJ considered the objective medical evidence, Catrina's subjective complaints, Catrina's subjective reports of what she was physically able to do, her treating doctor's opinion, and the ME's opinion, among other evidence of record. The ALJ expressly noted times when Catrina complained of fatigue and pain. Moreover, within the evidence the ALJ discussed were Catrina's complaints of pain and fatigue, and therefore, the ALJ necessarily considered the nature of Catrina's fibromyalgia. There is no indication in the ALJ's Decision that he turned a blind eye to such complaints that were not necessarily reflected in objective medical findings. In her Reply, Catrina argues the question is whether the ALJ analyzed and had appropriate reasons to discount contrary evidence. Beyond Catrina's subjective statements, the contrary evidence included Dr. Hanna's opinion. For the reasons discussed below, the ALJ did not reversibly err in his consideration of that opinion.

**B**

Catrina next argues that the ALJ's RFC assessment appears to be based upon another ALJ's RFC assessment for her prior disability claim and on the ME's answers to post-hearing interrogatories in this case. She does not elaborate upon the former argument in any meaningful way, and so the Court will not address it. *U.S. v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"). Catrina separates her latter argument (ALJ's reliance upon the ME's opinion) from the final argument in her Motion for Summary Judgment that the ALJ's evaluation of the medical opinions is not supported by substantial evidence. As an ALJ must consider opinions from medical sources in determining a claimant's RFC, the Court considers those arguments together to determine whether the ALJ's RFC is insufficiently supported. *See Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) ("Although the ALJ does 'not give any special significance' to ['medical opinions' that are not the kind an ALJ must evaluate under the regulatory checklist], he still must consider 'opinions from medical sources' in determining the claimant's [RFC]"), *citing* 20 C.F.R. § 1527(d)(2)-(3). The Commissioner argues the ALJ reasonably assessed the factors an ALJ must consider in assessing a claimant's RFC. The Commissioner highlights the ALJ's consideration of Catrina's objective examination findings which showed mild or moderate abnormalities on radiographic imaging and normal motor strength in her upper and lower extremities, and his consideration of Catrina's description of her daily activities. Specifically with regard to the ALJ's consideration of the medical opinions, the Commissioner argues the ALJ gave good reasons for rejecting treating Dr. Hanna's assessment.

20 C.F.R. § 404.1527(c) provides:

How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

The listed factors include:  1) examining relationship; 2) treatment relationship, which in turn includes length of the treatment relationship and the frequency of examination, and the nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) other factors brought to the Social Security Administration's attention.  *Id*.  Though an ALJ must give controlling weight to the medical opinion of a treating physician, the ALJ must do so only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), *citing Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2)[2].

## 1

In his Decision, the ALJ articulated four reasons why he determined Dr. Hanna's opinion was not entitled to controlling weight.  In support of those reasons, the ALJ cited to the fact that Dr. Hanna's own treatment notes repeatedly documented that Catrina exhibited only "moderate pain behavior" and did not present in acute distress due to the symptoms and effects of her musculoskeletal/immunological impairments, there was reason to believe any presentation of attention or memory deficits might not be credible, and the 6 months between follow up appointments in April and October 2016 suggested

---

[2] The treating physician rule found in 20 C.F.R. § 404.1527 has since been eliminated by the Social Security administration.  However, the rules in § 404.1527 apply to claims filed before March 27, 2017.

Catrina's impairments were not so severe as to necessitate more frequent monitoring.

Catrina argues the ALJ cherry picked Dr. Hanna's records by ignoring those records which showed she consistently reported generalized body pain, joint pain, and fatigue/malaise and the objective physical exams which showed multiple positive tender point examinations and limited range of motion with pain to many joints. However, in his discussion of the record evidence, the ALJ included Catrina's complaints of pain and fatigue and the results of objective medical testing including positive tender point examinations and limited range of motion. The ALJ's explanation of the weight he gave Dr. Hanna's opinion shows that the ALJ determined Dr. Hanna's notes of "moderate pain behavior" were more consistent with and supported by the evidence as a whole than was his opinion Catrina was so limited by her impairments that she would miss four work days per month (among other opinions of limitation in walking, sitting, standing, lifting, carrying, paying attention and concentrating). In other words, the ALJ did not ignore evidence pointing to disability, he simply determined such evidence was outweighed by other evidence of record.

Catrina further argues the ALJ cherry-picked where he cited the September 2014 psychological consultative examiner Singley's observations that Catrina displayed dramatic behaviors but ignored the fact the examiner believed her dramatic behavior "appear[ed] to reflect serious physical discomfort" and believed she may have "Possible Somatoform Features in the Physical/Medical Sphere." AR 518, 520. As the ALJ noted in his Decision, Singley's examination report provided that Catrina's effort during memory testing "smacked of some 'acting'" and the "reliability of performance here may be questionable." AR 519. In the Comments section of his examination report, Singley stated, "Reading the medical reports available here, and based on the rather dramatic demeanor, there

17

seems the possibility of a somatoform feature to the picture but this kind of issue is almost impossible to prove one way or the other." Even assuming it was error for the ALJ to neglect to include Singley's "impression" of "Possible Somatoform Features," the error was harmless; Singley himself had only an "impression," he acknowledged it was not easily proven, Catrina points to no other medical records in this case that indicated she suffered from or was otherwise diagnosed with a somatoform disorder, and the ALJ provided other reasons to assign Dr. Hanna's opinion less than controlling weight. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the same result).

With regard to the ALJ's determination that any opinions Dr. Hanna provided as to Catrina's difficulties to walk or stand due to her Achilles heel would be outside his area of expertise, the ALJ reasonably considered the evidence he cited in support of that conclusion. He cited not only a record in which Catrina alleged she reinjured her heel/foot, but he also explained that "the medical record [did] not suggest that the claimant has extreme difficulties with walking or standing due to [RA] or fibromyalgia or other impairment within Dr. [Hanna's] area of expertise as a rheumatologist, and he cites no objective testing to support this assertion." AR 31. The ALJ built a logical bridge between the evidence and his conclusion in this regard. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion"). Dr. Hanna's April 2014 opinion did not provide Catrina needed a hand-held assistive device for ambulation due to RA or fibromyalgia, and his treatment notes included Catrina's *subjective* comments that she needed/used a cane for ambulation. In her Motion for Summary Judgment, Catrina cites to her subjective complaints and physical examinations

which showed limited range of motion; as already addressed previously, the ALJ explained in his Decision that Catrina's subjective statements were not entirely consistent with the record evidence, and many of her testified-to limitations were accounted for in the ALJ's RFC finding. Catrina essentially invites the Court to reweigh the evidence though it cannot do so. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (explaining that in reviewing an ALJ's decision, the court cannot reweigh evidence, resolve conflicts in the record, decide questions of credibility, or otherwise substitute its own judgment for that of the Commissioner).

Catrina's arguments that the ALJ improperly discounted Dr. Hanna's opinion by misunderstanding the nature of fibromyalgia and drawing a negative inference from the fact she did not see Dr. Hanna more often fare no better. True, the ALJ cited to objective testing in support of his conclusion regarding Dr. Hanna's opinion. But Dr. Hanna also pointed out that Catrina did not present in acute distress due to symptoms, he earlier explained how Catrina's statements as to the intensity and persistence of her symptoms were not entirely consistent with the medical and other evidence, and, as the Commissioner argues (and addressed above) many of Catrina's statements qualifying her activities were accommodated by the ALJ's functional capacity limits. While Catrina argues in her Reply brief that the ALJ engaged in lay speculation by highlighting Dr. Hanna's observation of Catrina's "moderate pain behaviors" to support his finding of non-disability, her attempt to assign error in that way fails. Dr. Hanna's treatment records said what they did and the ALJ was within his authority to consider and cite to those records. The Court does not see how the ALJ engaged in lay speculation by reciting, verbatim, parts of Dr. Hanna's treatment records which used the word "moderate" rather than "severe." One would expect a medical doctor to know the difference between "moderate" and "severe" and to know which term to use to convey the doctor's examination and observation at that particular time.

As for the ALJ's reliance upon the six-month period between Catrina's follow-up visits with Dr. Hanna, Catrina is correct that an ALJ has an obligation to inquire into the reasons for such a gap in treatment. SSR 16-3p, at *9-10. Nevertheless, the ALJ's error was harmless. The ALJ did not rely solely upon that fact in support of his decision to give Dr. Hanna's opinion less than controlling weight and to discount the intensity and persistence of Catrina's symptoms. Catrina also only suggests she "may have good reasons" for any perceived failure to seek more treatment. She cites to just one medical record in which she reported to Dr. Hanna she wanted to "hold off on at [sic] this physical therapy for now as she has limits what her medical insurance will cover." AR 528. That visit was on November 7, 2014 and Dr. Hanna noted "Return visit 5 months," the appointment preceding that one was on June 19, 2014 at which time Dr. Hanna noted "Return visit 4 months," and Catrina returned for a visit following her November 2014 appointment on February 19, 2015. One offhand comment in a span of 8 months during which Catrina consistently returned for treatment does not convince the Court a different result would be reached on remand. Moreover:

> [I]t must be recalled that a plaintiff's lawyer also has a responsibility to develop his client's case and thus to explore possible reasons why the client did not seek medical care in the face of claimed illness when common sense and human experience would have expected a person in distress to have done so. A claimant's lawyer cannot remain mute and then fault the ALJ. Since the applicant and her lawyer know those reasons better than anyone, a social security claimant bears the burden of supplying evidence to prove his claim of disability, *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004), and an ALJ is "entitled to assume" that an applicant represented by an attorney is making his "strongest case for benefits." *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987).

*Orienti v. Astrue*, 958 F. Supp. 2d 961, 978 (N.D. Ill. 2013).

2

To the extent Catrina argues that the ALJ's RFC assessment "appears" to be based upon the ME's answers to post-hearing interrogatories, she identifies three discrete errors the ALJ allegedly made in doing so:  1) the ME's opinion is based, in part, on mistaken belief that Catrina had not seen her rheumatologist in approximately 20 months; 2) the ME did not consider Catrina's statements as to how her fatigue and pain affected her; and 3) the ALJ failed to ask the ME how Catrina's fibromyalgia and other impairments affected her ability to meet the mental demands of work.

In his Decision, the ALJ explained he gave "significant weight" to ME Dr. Duby's opinion because "as a rheumatologist, he is a specialist in the medical field related to inflammatory arthritis and based his opinion upon a review of [Catrina's] longitudinal medical evidence of record, and is consistent with the objective findings and other medical evidence of record."  AR 31.  The ALJ continued that he did not give Dr. Duby's opinion controlling weight because he was not a treating doctor and did not have the ability to personally assess Catrina on multiple occasions with a baseline perspective.  AR 32.  As the Commissioner argues with regard to the latter determination, the ALJ assessed greater limitation than did Dr. Duby with respect to lifting no more than 10 pounds.

Catrina unconvincingly argues the ALJ should not have afforded the ME's opinion the weight he did where one factor the ME considered to support his non-disability opinion turned out to be somewhat inaccurate.  It is unreasonable for Catrina to expect the ALJ would reject the ME's opinion for the mere reason that he was unaware Catrina saw her rheumatologist just two days before the ME issued his opinion, especially where the record does show a gap in Dr. Hanna's treatment records of more than a year.  In any event, Catrina does not otherwise

argue that the ME's observation that the rheumatologist's records ended in February 2015 was inaccurate.

The fact that the ME was not provided Catrina's hearing testimony also does not render the ALJ's determination to give the ME's opinion significant weight erroneous. Though she argues the HALLEX provides that an ALJ's office will send the ME a transcript or summary of pertinent testimony provided at a hearing (which the ALJ apparently did not do here), the Seventh Circuit Court of Appeals "has not addressed whether the HALLEX provides rules of law that the ALJs must follow or risk reversal." *McMurtry v. Astrue*, 749 F. Supp. 2d 875, 880 (E.D. Wisc. 2010). The ME's citation to the record evidence makes clear he had evidence of Catrina's complaints of fatigue and pain before him, and the ME explicitly noted her inflammatory arthritis was established by evidence including notes of joint pain, fatigue, and malaise. Also, once again, the ALJ properly considered Catrina's statements about the limitations her impairments caused her; he built a logical bridge between the evidence and his conclusion that her statements about the limitations her impairments caused were out of proportion to what the record evidence as a whole indicated. The fact the ALJ did so while the ME did not express an expert opinion on how Catrina's fibromyalgia and other impairments affected her ability to meet the mental demands of work does away with her third contention of error. Catrina's arguments as to Dr. Duby's opinion are nothing more than nitpicking. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (providing that the reviewing court will give the ALJ's opinion a "commonsensical reading rather than nitpicking at it"). Ultimately, the ALJ considered factors under 20 C.F.R. § 404.1527(c) when he weighed Dr. Duby's opinion – Dr. Duby was a specialist in rheumatology, it was supported where based upon his review of the longitudinal medical evidence of record, and his opinion was consistent with

evidence of record.  The Court finds no error that warrants reversal or remand of this case, and the ALJ's Decision is supported by substantial evidence of record.

## V

For the reasons set forth above, it is recommended that:  1) the Plaintiff's Motion for Summary Judgment (Doc. 12) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 17) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security, denying benefits to the Plaintiff, Catrina C., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation.  FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on August 5, 2019.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE